Argued and submitted July 3, affirmed October 30,
petition for rehearing denied November 27, 1979

MEEKER, et al,
*Petitioners,*

*v.*

BOARD OF COMMISSIONERS OF
CLATSOP COUNTY,
*Respondents,*
PAULEY,
*Intervenor-Respondent*

(TC CC 77-303, CA 9164, SC 25951)

601 P2d 804

Robert E. Stacey, Jr., Portland, argued the cause and filed the brief for petitioners.

John Bagg, Astoria, argued the cause for respondents. On the brief was W. Louis Larson, Clatsop County Counsel, and Lewis C. Littlehales, Assistant Clatsop County Counsel, Astoria.

Jeanyse R. Snow, Astoria, filed a brief for intervenor-respondent.

Amicus Curiae briefs were filed for the Land Conservation and Development Commission. On the briefs were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, Frank Josselson, Special Assistant Attorney General, and Michael D. Reynolds, Assistant Attorney General, Salem.

TONGUE, J.

HOLMAN, J., concurring opinion.

**TONGUE, J.**

This case involves the application of the Land Conservation and Development Commission's (LCDC's) Statewide Planning Goal 3 "to preserve and maintain agricultural lands" as that Goal relates to the subdivision of 82 acres of agricultural land in Clatsop County. The Board of Commissioners of Clatsop County approved a proposed plan to divide that land into 6 parcels ranging in size from 10 to 20 acres. Petitioners are two local residents who challenged this decision by a writ of review in the circuit court. The circuit court approved the Board's decision and dismissed the writ. The Court of Appeals affirmed. 36 Or App 699, 585 P2d 1138 (1978). We granted review because of our concern whether the Board of Commissioners and the Court of Appeals properly applied the requirements of Goal 3.

*The Proceedings Before the Board of Commissioners and Circuit Court.*

The land in question is known as Elk Meadows and is located on the Nehalem River near Elsie. In previous years a succession of owners operated a commercial dairy on the property. That operation was discontinued in 1968. Since then the only use of the land has been for the production of hay.

The land was purchased by Norman Pauley and four others, who then applied to the Clatsop County Planning Commission for approval of the proposed plan. After several hearings at which petitioners raised their objections, the Planning Commission approved the application. Petitioners then appealed to the Board of Commissioners, which reversed the decision of the Planning Commission because it had failed to determine whether the proposed subdivision conformed to LCDC's Agricultural Lands Goal (Goal 3).

On remand, the Planning Commission denied the application based on findings that the existing commercial agricultural enterprise in the area was beef

raising, that the proposed parcels lots were too small for such an enterprise, and that the proposed plan did not meet the requirements as set forth in ORS 215.213(3) for nonfarm dwellings in an exclusive farm use zone.[1]

Mr. Pauley appealed this denial to the Board of Commissioners. The Board heard additional testimony from numerous witnesses to the effect that the predominant land use in the area was for small "part-time farms" (of the size proposed by the plan) that produced livestock for both home consumption and for sale and that most of the larger farms in the area had ceased production because they were unprofitable. The testimony of these witnesses is discussed in greater detail below. Petitioner Meeker, who with his family operates a "full-time" 80 acre beef ranch across the river from the land in question, disputed the testimony that Elk Meadows could not be operated profitably as an undivided parcel by pointing to his own operation.

After hearing this testimony, the Board voted to approve the proposed subdivision based upon the following findings:

"1. That the proposed use does not constitute urbanization because the evidence presented demonstrated that the proposed sizes of lots within the subdivision are compatible with the sizes of other agricultural land holdings in the area and that such subdivision of the land and resulting use thereof will not interfere with the agricultural activities in the area based upon the testimony of the witnesses presented by the Appellant.

"* * * * *

"4. That the testimony of the witnesses, in particular the County Farm Extension Agent, was convincing that the proposed development will provide greater agricultural utilization of the land than the present site due to the economics of farming in the recent past, the present, and what is indicated for the future.

---

[1] *See* note 6, below.

"5.  That the general area in which the proposed development exists has proven through the past number of years that a farm of the size of the proposed development held in one farm unit is not of a conducive size to result in a viable commercial agricultural enterprise due to the economics of farming and that reduction in size permits greater intensification of use with less requirements for capital expenditure in the form of equipment and land cost, and thereby results in greater production. This phenomena [sic] is demonstrated by the evidence of the witnesses that the proposed lot sizes are consistent in size with a majority of the existing viable commercial agricultural enterprise units within the area of the Nehalem Valley.

"6.  That the LCDC Goals pertaining to agricultural land did not provide a minimum lot size and that the testimony presented by the parties demonstrates that the proposed sizes of lots within the subdivision are consistent with the existing viable agricultural units within the area and therefore, are appropriate for the preservation of the agricultural lands in this area of Clatsop County.

"7.  The contentions of the parties pertaining to subparagraph 3 of ORS 215.213 concerning nonfarm single family use does not apply because this development will be agricultural in nature.

"* * * * *

"9.  That the definition of commercial means that the band [sic] unit produces more farm products than are consumed upon the land. Said definition was presented by staff and represented to be that of a recommendation from the LCDC staff members and representative to this County, Mr. Neil Coenen.

"10.  That the testimony of the Clatsop County Farm Extension Agent that Clatsop County land in the Nehalem Valley, though of soil Class 1 through 4, is not conducive to large agricultural enterprise due to inadequate weather conditions is concurred in by this Board. Such conclusion is further borne out by the fact that there are no farm implement dealers within Clatsop County, and as a general rule, all agricultural areas typically have farm implement dealers in the vicinity.

[669]

"11. That the proposed utilization of the land will preserve the farm land for the future because it will enable people to retain land due to the reduction of the amount of the investment necessary to own the land and to effectively use it for agricultural pursuits * * *.

"* * * * *"

The Board's action was affirmed by the circuit court in the writ of review proceeding, in which Mr. Pauley intervened. Petitioners then appealed to the Court of Appeals.

*The Decision of the Court of Appeals.*

Petitioners' two assignments of error in the Court of Appeals were (1) that "[t]he Board's findings in applying the Agricultural Lands Goal were not supported by reliable, probative and substantial evidence," and (2) that "[t]he Board improperly construed the farm use and minimum lot size standards of LCDC's Agricultural Lands Goal."

In considering the first of these contentions the Court of Appeals noted that:

"* * * The Board found that the proposed smaller acreage lots would be comparable to and compatible with other existing agricultural uses in the area. It also found that a large farm unit comprising the area of development would not be economically viable and *that smaller units, as proposed, would facilitate greater agricultural usage in the foreseeable future, just as in the past and at present. * * *"* (Emphasis added) 36 Or App at 702-703.

After quoting the specific findings made by the Board, the court held (at 704-705) that:

"The Board's findings support its reasoned conclusion that the proposed subdivision will serve the policies of Goal #3 and ORS 215.243 more effectively than would retention of the acreage in a single parcel. Although there were conflicts in the evidence before the Board, there is substantial evidence in the record to support the Board's findings. * * *"

[670]

The Court of Appeals then addressed petitioners' contention that the Board misconstrued the term "commercial" in the Goal 3 requirement that minimum lot sizes in farm use zones be "appropriate for the continuation of existing commercial agriculture within the area." The court summarized the parties' disagreement as follows (at 706):

> "* * * Petitioners argue that a commercial farm is one that 'supports a family, if not hired hands,' while respondents contend that a farm is commercial if it yields agricultural products which are sold for a profit. * * *"

The court concluded, however (at 706-707):

> "* * * Petitioners' position might have merit if it were possible to support a family by farming the undivided parcel, but we are bound by the Board's valid finding that it is not.
>
> "It is unnecessary in this case to draw the definitional limits of the term 'commercial' as used in Goal #3, because the Board lawfully found that for now and the foreseeable future the proposed subdivision would be more agriculturally productive than a larger farm and that the proposed smaller farms are consistent with existing farming practices in the area. Assuming for argument that Goal #3 requires that minimum lot sizes in an EFU [Exclusive Farm Use] zone be such as will maximize agricultural production, as opposed to merely accommodating agriculture, that standard has been met in this case."

For these reasons, the Court of Appeals affirmed.

*The Petition for Review.*

Petitioners then petitioned this court for review, contending that the Court of Appeals erred (1) "in concluding that the county's findings about productivity made application of Goal 3's lot size standard unnecessary"; and (2) in holding that the Board's finding that "the proposed lot sizes are consistent in size with a majority of the existing viable commercial agricultural units within the area of the Nehalem

Valley" is supported by reliable, probative and substantial evidence.[2]

*LCDC's Goal 3, to "Preserve and Maintain Agricultural Lands."*

LCDC's Goal 3 provides:

> "Agriculture lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. *Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the area.* \* \* \*" (Emphasis added)

Clatsop County has not yet adopted exclusive farm use zones pursuant to ORS Chapter 215. All parties to this case agree, however, that the requirements of Goal 3 must be satisfied in order for the subdivision of agricultural land such as Elk Meadows to be proper.[3] The dispute in this case centers on (1) what those requirements are, and (2) whether those requirements have been met in this case.

(1) *The requirements of Goal 3.*

The parties disagree as to just what Goal 3 requires. It also appears that the positions of the parties on this question as well as that of LCDC, have changed during the long course of these proceedings. The LCDC, in a supplemental memorandum as amicus curiae in response to a question put by this court after the oral argument of this case before this court, now contends that before the Board of Commissioners could properly apply the requirements of Goal 3 to the facts of this case the Board was first required to make five findings

---

[2] Petitioners also contend that the Court of Appeals decision "depends upon an improper interpretation of ORS 215.213(1)(e)" in that "[r]esidences constructed in a rural residential subdivision, where incidental farming may or may not occur on the parcels, are not dwellings customarily provided in conjunction with farm use." That contention is discussed in note 6, below.

[3] *See* ORS 197.175(1); *Peterson v. City of Klamath Falls,* 279 Or 249, 253-54, 566 P2d 1193 (1977); and ORS 197.300(1)(b).

of fact, which were not made in this case and that, as a result, this case must be remanded to the Board for that purpose.[4] Petitioners also contend that the case should be remanded to the Board.

[4] The position of LCDC is stated as follows:

"Goal 3 requires that lot sizes within exclusive farm use zones be appropriate for the continuation of the commercial agricultural enterprise within the area. In order to satisfy this requirement for a subdivision or partition which is to be for a farm use, a developer would have to prove, and the county would have to find, that the lots within the development would be appropriate for the continuation of the existing commercial agricultural enterprise within the area. Moreover, because ORS ch 92 and Goal 3 require county approval of subdivisions and partitions of rural agricultural lands, the county must also apply the policies of ORS 215.243 in its determination of whether to approve or deny such division of land. ORS 215.263(3).

"To satisfy these standards, the county must make five findings before approving a subdivision or partition of rural agricultural lands:

"*Finding #1:* What is (are) the existing commercial agricultural enterprise(s) within the area? Goal 3. * * *.

"*Finding #2:* What are appropriate lot sizes for each such commercial agricultural enterprise? Goal 3.

"*Finding #3:* Is the undivided parcel appropriate for the continuation of any such enterprise? Goal 3. If so, then ORS 215.243(3) favors preservation of the maximum amount of the limited supply of agricultural lands 'in large blocks' and any decision whether to allow a partition or subdivision of such a parcel must be in accordance with this policy. ORS 215.263(3).

"*Finding #4:* (Assuming appropriate responses to Findings 1, 2, and 3). Would the lots created be sufficiently large to continue the existing commercial agricultural enterprise of the area and, implicitly, promote the present and future agricultural economy of the state? ORS 215.243; Goal 3. That is, are the lots created of sufficient size to permit commercial scale production of those agricultural commodities which compose the existing commercial agricultural enterprise within the area? If there is more than one such enterprise in the area, the policy in ORS 215.243(2) favors protecting the one requiring larger lot sizes.

"*Finding #5:* (Assuming appropriate responses to Findings 1, 2, 3, and 4). Has the county effectively prohibited the citing of non-farm uses which would have the effect of irrevocably removing the lots within the proposed subdivision or partition from being available for commercial-scale agricultural production. In other words, has the county by ordinance, plat conditions or otherwise, prohibited the erection of such permanent improvements as tennis courts, swimming pools or non-essential driveways which would otherwise interfere with or preclude the usage of the lots for commercial-scale agricultural production?"

In response to a question put by this court the petitioners, respondents and LCDC appeared to agree that the words "commercial agricultural enterprise" refer to more than just farms. As LCDC stated in its *amicus* brief (with which petitioners concur):

> "Commercial agriculture * * * involves more than just agricultural production—it involves the entire marketing system through processing, packaging, distributing, wholesaling and retailing. * * *"

To the same effect, respondents stated:

> "* * * '[C]ommerical agricultural enterprise' refers to farms in the traditional sense, but also those other industrial and commercial activities in ORS 215.203 that make possible the growing of crops and the raising of livestock and the eventual consumption of those products by members of our society."

In other words, this *aggregate* of agricultural activity constitutes the "commercial agricultural enterprise within the area" that Goal 3 requires be continued by the utilization of appropriate lot sizes. Assuming, for purposes of this case, that this definition of "commercial agricultural enterprise" is correct, it follows that a lot size is "appropriate" under Goal 3 if it is sufficient for a farm operation of a type that will continue or support this commercial agricultural enterprise within the area.

As previously noted, the findings by the Board of Commissioners in this case include the following findings of fact:

> "4. That * * * the proposed development will provide greater agricultural utilization of the land than the present site due to the economics of farming in the recent past, the present, and what is indicated for the future."

> "5. That the general area in which the proposed development exists has proved through the past number of years that a farm of the size of the proposed development held in one farm unit is not of a conducive size to result in a viable commercial agricultural enterprise due to the economics of farming * * * the

proposed lot sizes are consistent in size with a major- ity of the existing viable commercial agricultural enterprise units within the area of the Nehalem Valley."

"6. That * * * the proposed sizes of lots within the subdivision are consistent with the existing viable agricultural units within the area and therefore, are appropriate for the preservation of the agricultural lands in this area of Clatsop County."

"10. That * * * Clatsop County land in the Nehalem Valley * * * is not conducive to large agri- cultural enterprise * * *."

█ We agree with the Court of Appeals that such findings, although not in the same terms as now pro- posed by LCDC, are sufficient, if supported by sub- stantial evidence, to satisfy the requirements of Goal 3. If, as we have assumed, Goal 3 requires that it is the entire aggregate of activities that is the "commercial agricultural enterprise within the area" that must be continued and supported, such an "enterprise" is bet- ter continued and supported by dividing a more-or-less idle 82 acre farm, and one which is likely to remain idle in the future, into 6 smaller farms of from 10 to 20 acres *if,* as found by the Board, the result will be *"greater* agricultural utilization of the land." We therefore turn to the findings of the Board to see if they are supported by substantial evidence.

Upon examination of the record we find that there was testimony that although this 82 acre tract had previously been operated as a dairy farm for many years, it had not been operated as a dairy farm for the past few years, apparently for economic reasons, but had been used only to produce hay of poor quality, which in some years was sold for from $1,000 to $1,500. The county agent testified that the tract was too small for profitable operation either as a dairy farm or for raising beef cattle and that he would "almost say" that there was "no current economical use of the land." He also expressed the opinion that if divided with 10 to 20 acre parcels it "would be more productive," assuming that the owners of such tracts

had "the so-called green thumb" and the "drive to put a little muscle and sweat out there."

There was also testimony that the Oregon Game Commission was "buying up all the big farms" in the area; that most of the larger farms in the area had "shut down" or were "shutting down" and were "being cut up into smaller farms because they just can't make it on the big farm"; that 95% of the "operations" in the area are on 20 acre tracts; that "everybody works out, nobody lives in, unless they're on welfare" and that "most of them raise a few beef" or "something like that," such as "sheep or other animals," some of which are "sold to produce additional income." Other witnesses testified to the same effect.

In addition, a prospective purchaser of one of the proposed lots from this property testified that he intended to operate in substantially that same manner and Mr. Pauley, the intervenor, testified that other prospective purchasers had substantially "the same idea."

This evidence may not be as clear and convincing as might be desired. There was also other conflicting testimony, including testimony that petitioner Meeker, with a farm of comparable size, had been able, by hard work, to make a living from raising beef cattle. We are required, however, to affirm findings of fact in such cases when supported by substantial evidence. After reviewing the record in this case, including this testimony, we agree with the holding by the Court of Appeals that there was substantial evidence to support the finding by the Board of Commissioners that the proposed division of this 82 acre tract into six tracts of from 10 to 20 acres for small farms will "provide greater agricultural utilization of the land than the present site." For these reasons, and based upon that finding, we conclude that the requirements of Goal 3 have been met in this case.

Petitioners and LCDC, as amicus, express concern that to affirm the action by the county in this case will "open the door" to abuse and will defeat the purposes of Goal 3 by making it possible to subdivide productive agricultural lands into small tracts by the subterfuge of a non-enforceable promise that the purchasers of such tracts will continue to use such lands for agricultural purposes, which may be no more than growing a small amount of berries, tomatoes or potatoes and selling some of them.

We are also concerned over the need to preserve existing agricultural lands in Oregon. We would point out, however, that we are not holding that in *all* cases a finding by a county that greater agricultural utilization of land will result from smaller parcels will satisfy the requirements of Goal 3. We hold only that the requirements of Goal 3 are satisfied under the facts and circumstances of this case, which we believe to be unique. There was evidence in this case from which the Board of Commissioners was entitled to find that this 80 acre tract is marginal agricultural land which cannot now or in the foreseeable future be found profitable; that even larger farms in the area were not economical to operate; that most farming operations in the area were on small farms of from 10 to 20 acres in size, and that greater agricultural utilization would result from breaking the undivided parcel into small farms of that size.

Although members of this court might draw different conclusions from the conflicting evidence in this case, if this court were free to make its own findings of fact, this case comes to the courts on a writ of review under ORS 34.040, under which the courts are permitted to consider only whether there is "reliable, probative and substantial evidence" in the record to support the findings by the county. Also, we do not believe that it was the intent of the legislature in

enacting ORS 215.243(2) to require that tracts of marginal agricultural lands which cannot be farmed profitably must forever be "locked up."[5]

One of the principal difficulties of this case arises from the general, if not vague, terms of LCDC's Goal 3. If this court has misconstrued that goal, LCDC may amend it so as to make it more clear and understandable. Finally, we would note that under the terms of SB 435, as enacted by the Oregon Legislature at its last session (1979 Or Laws Ch 772), a Land Use Board of Appeals was established with exclusive jurisdiction to review all future land use decisions; that under the provisions of that bill (§§ 5 and 6), whenever it is contended that a land use decision violates LCDC "goals" that Board of Appeals must submit to the LCDC its recommendation concerning any such allegation and that LCDC shall thus "issue its determination on the recommendation," which is then binding upon the Board of Appeals. Under these circumstances, we believe that LCDC can deal adequately with any abuses that might otherwise result in future cases in the event that this court has misconstrued LCDC Goal 3.

For these reasons, the decisions by the Court of Appeals and circuit court are affirmed.[6]

---

[5] Also, it may be, as seems to be agreed by petitioners and respondents, that before the purchasers of these 10 to 20 acre tracts can secure building permits for the construction of houses and other buildings on such tracts, they must satisfy the county that such tracts will be used for agricultural purposes. That question, however, is not before the court in this case.

[6] Petitioners also contend in their petition for review that the Court of Appeals has misinterpreted ORS 215.213(1)(e) in that "residences constructed in a rural residential subdivision, where incidental farming may or may not occur on the parcels, are not dwellings 'customarily provided in conjunction with farm use'" permitted by ORS 215.213(1)(e), and that this misinterpretation permits developers to avoid the requirements of ORS 215.213(3) for dwellings "not provided in conjunction with farm use."

In addition, it is contended by the concurring opinion, but for different reasons, that the question of "farm use" under ORS 215.203(2)(a) should have been decided in this case.

It is now conceded by all parties, however, in response to a request by the court for supplemental briefs, that it follows from a finding that "the

**HOLMAN, J.,** concurring.

It is my conclusion that the parties in this case have had a limited vision of the issues, though invited by the court by its questions to counsel prior to argument to broaden their horizons. The principal issue, as I see it, is whether the use to which the property is being put complies with "farm use" as defined by ORS 215.203(2)(a). The parties have sidetracked themselves with detailed discussions of other aspects of the case. Regardless of the merits of these other arguments, if the proposed use is not a "farm use" as defined by ORS 215.203(2)(a), Goal 3 has not been complied with. That goal is as follows:

> "Agricultural lands shall be preserved and maintained *for farm use,* consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing *commercial agricultural enterprise* within the area. * * *" (Emphasis added.)

LCDC has specifically adopted the definition of "farm use" provided by ORS 215.203(2)(a), which is in part as follows:

development will be agricultural in nature" that the requirements of ORS 215.213(3)(a) relating to "single family residential dwellings not provided in conjunction with farm use" are not applicable in this case and that the term "farm use" need not be defined or applied in this case.

Under these circumstances we believe that it would be improper for the court to undertake to decide either the application of ORS 215.213 to the facts of this case or the question of "farm use" under ORS 215.203(2)(a) as applied to the facts of this case.

It should also be noted that this is not a case in which the parcel in question has potential for profitable operation as an addition to an existing farm. On the contrary, there was evidence before the Board that the land had been more or less idle for ten years; that most of the big farms in the area were shutting down; and that, according to the County Extension Agent, a farmer considering adding an 80-acre parcel to his existing operation should "just forget it" because "you can't make it" in that "the capital outlay * * * isn't there economically." *Compare Rutherford v. Armstrong,* 31 Or App 1319, 1323, 1324, 572 P2d 1331 (1977).

"As used in this section, 'farm use' means the current employment of land including that portion of such lands under buildings supporting accepted farming practices *for the purpose of obtaining a profit in money* by raising, harvesting and selling crops or by the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. * * * " (Emphasis added.)

In addition, in ORS 215.243 the legislature sets forth its land use policy, which in part is as follows:

"The Legislative Assembly finds and declares that:

"* * * * *

"(2) The preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources and the preservation of such land *in large blocks* is necessary in maintaining the agricultural economy of the state and for the assurance of adequate, healthful and nutritious food for the people of this state and nation." (Emphasis added.)

The issue is whether the use of the land in small parcels where the owners "live in" and "work out" and use the land to raise products for home consumption, selling any surplus, meets the definition of farm use as set forth in ORS 215.203(2)(a) as supplemented by LCDC Goal 3. It is my opinion that it does not.

The selling of surplus products over those needed for family use in such a situation is, in my opinion, not the use of land "for the *purpose* of obtaining a profit." (Emphasis mine.)[1] The purpose of the use of the property is for residence purposes while "working out" and to raise food for home consumption. The sale of any surplus is incidental and not the use of the land "for the purpose of obtaining a profit in money." There is no testimony that the small tracts could ever be

---

[1] I realize that a profit does not necessarily have to be made, only that the property be occupied for that purpose.

operated profitably. To make the matter even clearer, the 1979 Legislature amended ORS 215.203(2)(a) by the insertion of the word "primarily" in front of the just quoted words. To the statutory criteria is added the requirement of LCDC's Goal 3 that the land's use be part of a "commercial agricultural enterprise." While this term is used in reference to the total existing agricultural enterprise, including processing and marketing, it shows LCDC's intention as to the extent of the agricultural use which it contemplates.

When the above is coupled with the stated purpose of preserving agricultural land in "large blocks," the conclusion that the approval of such a plan as the present one was contemplated by either the legislature or LCDC, in my opinion, cannot logically follow. The subdividing of land as suggested here is an irreversible process. After the homes are built the land can never be converted to "commercial agriculture" or "open space." It is difficult for me to see how the legislature and LCDC could have worded *general* statutes and regulations to more clearly show that they would disapprove of the use contemplated here.

I concur in the majority opinion only because all concerned have steadfastly refused in the face of invitation to raise the issue whether the anticipated use here is "farm use." There may be reasons why it has not been but, if so, those reasons are not apparent either to me or to the rest of the court. By this statement I do not intend to imply that had the question been raised the remainder of the court would agree with me. There was no necessity for them to cross the bridge.