Argued and submitted March 25, affirmed September 21, 1981

## LANE COUNTY,
### *Petitioner,*

*v.*

## CITY OF EUGENE et al,
### *Respondents.*

### (No. 80-053, CA 19024)

633 P2d 1306

Cristie C. McGuire, Assistant County Counsel, Eugene, argued the cause for petitioner. With her on the brief was Lynn Rosik, Certified Law Student, Eugene.

Timothy J. Sercombe, Eugene, argued the cause for respondent City of Eugene. With him on the brief was Johnson, Harrang, Swanson & Long, Eugene.

Michael E. Farthing, Eugene, waived appearance for respondent E. O. Drake.

Richard P. Benner, Portland, filed a brief amicus curiae for 1000 Friends of Oregon.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Petitioner Lane County (County) seeks judicial review of an order of the Land Use Board of Appeals (LUBA) reversing the County's order granting the application of respondent E. O. Drake (applicant) for the partition of 142 acres of land, which all parties concede to be agricultural land. In this court, the County contends that LUBA exceeded its authority by reversing the decision of the County on an issue it argues was not raised below or before LUBA *(i.e,* that there was not substantial evidence to support the County's findings of fact), and that even if LUBA was authorized to consider that issue, it erred in its conclusion that there was not substantial evidence to support the County's findings. We affirm.

Applicant seeks to divide the 142-acre parcel into two parcels consisting of 5 and 137 acres, respectively. The 142-acre parcel is a portion of a larger 152-acre parcel which had been partitioned into four separate lots in a prior proceeding. The property is zoned by Lane County as Airport Vicinity (AV) and is designated on the regional comprehensive land use plan, not yet acknowledged, as an "opportunity area" suitable for large scale development. The property is in the vicinity of the Mahlon Sweet Airport, which serves the Eugene-Springfield metropolitan area.

The City of Eugene (City) owns the property directly north of the subject property and is considering construction of an airport runway on adjacent land. Applicant is a retired farmer who leases to others approximately 140 acres for the growing of grain or grass crops. The proposed five-acre parcel, which contains a dwelling and barns, is currently being operated as a base for a sheep-raising operation; applicant states that he intends to continue that use after the partition. The proposed five-acre parcel is in the middle of the larger parcel and the applicant submitted with his request a "future street plan" showing the property being crossed by three streets 60 feet in width. Access to the small parcel would be insured by means of an easement across the larger parcel.

The County Development Review Commission approved the partition application based upon written findings. The City appealed the proposed decision on the

ground that it violated applicable statewide planning goals, especially Goal 3 governing preservation of agricultural lands,[1] and on other grounds not relevant here. The Planning Director then rescinded his approval.

Thereafter, applicant submitted two letters addressing the City's concern about violations of the agricultural goal. The first letter was from the applicant, and the second was from an Oregon State University Livestock Extension Agent. Based upon those letters, which we discuss below, the Planning Director approved the partition. The City appealed again, contending that there were insufficient findings and evidentiary support for the stated findings to demonstrate conformance with various statewide planning goals, specifically Goal 3.[2] The County Board of Commissioners approved the partition after a public hearing, based upon its Findings of Fact and Conclusions of Law. The City appeared at that hearing.

---

[1] Goal 3 provides, in part:

"Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise with the area. Conversion of rural agricultural land to urbanizable land shall be based upon consideration of the following factors: (1) environmental, energy, social and economic consequences; (2) demonstrated need consistent with LCDC goals; (3) unavailability of an alternative suitable location for the requested use; (4) compatibility of the proposed use with related agricultural land; and (5) the retention of Class I, II, III and IV soils in farm use. A governing body proposing to convert rural agricultural land to urbanizable land shall follow the procedures and requirements set forth in the Land Use Planning goal (Goal 2) for goal exceptions.

"* * * * *." OAR 660-15-000(3).

[2] The City's letter of appeal to the Lane County Planning Department set forth the following grounds addressed to the violation of statewide planning goals:

"Several of the issues germane to this appeal were raised in an October 24, 1979, memorandum (copy attached) from the Eugene Planning Department to the Land Division Review Committee. Those concerns are not adequately addressed in the Notice of Intent to Approve. More specifically, there are insufficient findings and evidentiary support for stated findings to demonstrate conformance with various statewide land use goals. * * *

"* * * * *

"Statewide Planning Goal 3 requires the preservation of agricultural land as defined. And it is undisputed that the subject property is agricultural

The City filed a Petition for Review with LUBA, contending, so far as relevant here, that the County erred in the following conclusions of law in its order approving the partition:

"* * * * *

"D.  Goal 3 is applicable to this partition application and is satisfied by reason of the continuation of existing commercial agricultural enterprises on both parcels created by this partition.

"E.  . . . No exception is required to Statewide Planning Goal 3 because it has been applied and satisfied in this proceeding. . . .

"F.  Substantial evidence is contained in the record to support approval of this major partition and to demonstrate compliance with all existing rules, regulations and court decisions."

The City asserted that the conclusions were unlawful "in that they are not supported by the record and resting upon an erroneous construction of the applicable law, especially Goal 3."

After briefs and oral arguments were submitted and heard, LUBA issued a proposed opinion and final order reversing Lane County's decision granting the partition.

---

land. Minor partitioning itself is not necessarily an indication that agricultural pursuit is no longer tenable. However, it appears that the combination of cumulative minor partition approval, AV zoning, and the 1990 Plan opportunity area designation compel the conclusion that should the trend continue, it will become increasingly difficult to assure the agricultural productivity of the area involved. Moreover, there is no finding, condition, or factual basis to assume that because continuation of agricultural use *may* be feasible, that such use *will* continue. It is obvious that the creation of smaller parcels create the potential for resale to a buyer who intends nonagricultural use permitted by the existing AV zoning. Such resale potential is greater with the lower cost of smaller parcels as contrasted with the sale of the entire tract. Thus, the initial findings expressly stated (and are supported in the record) that 'Current use of the land is viewed as temporary until need and/or demand is developed for airport related facilities . . . .' Statewide Goals 2 and 3 are directly applicable in the absence of an applicable State-acknowledged plan. Goal 3 requires that 'agricultural uses shall be preserved and maintained for farm uses . . . .' If the County chooses not to apply Goal 3 in this instance, we believe the exception procedure in Goal 2 should be pursued." (Emphasis in original.)

The October 24, 1979, memorandum referred to in the letter of appeal contained the following comment concerning the proposed partition:

"The continued approval of land division of this property lessens its agricultural suitability by fragmenting the parcel. The County has an affirmative obligation to insure continued farm use under Statewide Goal 3."

Pursuant to Oregon Laws 1979, chapter 772, section 6,[3] the proposed order was submitted to the Land Conservation and Development Commission (LCDC) for consideration of the issues raised relating to alleged violations of Statewide Goal No. 3. Over the County's exceptions to the proposed order, LCDC affirmed LUBA's recommendation, and a Final Order and Opinion reversing Lane County's decision was issued by LUBA on September 9, 1980.

The County's first assignment of error, although stated as presenting one issue, has two prongs: May LUBA (1) decide an issue not raised before the County Board or (2) an issue not argued before LUBA? We treat the two prongs separately. We need not dwell on the question of whether the City raised before the County the issue involving the

___

[3] Or Laws 1979, ch 772, § 6, so far as relevant, provides:

"(1)  At the conclusion of a review proceeding under sections 4 and 5 of this 1979 Act, the board shall prepare a recommendation to the commission concerning any allegations of violation of the state-wide planning goals contained in the petition and shall submit a copy of its recommendation to the commission and to each party to the proceeding. The recommendation shall include a general summary of the evidence contained in the record and proposed findings of fact and conclusions of law concerning the allegations of violation of the state-wide planning goals. The recommendation shall also state whether the petition raises matters of such importance that the commission should hear oral argument from the parties.

"(2)  Each party to the proceeding shall have the opportunity to submit written exceptions to the board's recommendation, including that portion of the recommendation stating whether oral argument should be allowed. The exceptions shall be filed with the board and submitted to the commission for review.

"(3)  The commission shall review the recommendation of the board and any exceptions filed thereto. The commission shall allow the parties an opportunity to present oral argument to the commission unless the board recommends that oral argument not be allowed and the commission concurs with the board's recommendation. The commission shall be bound by any finding of fact of the city, county, special district or state agency for which there is substantial evidence in the record. The commission shall issue its determination on the recommendation of the board and return the determination to the board for inclusion in the board's order under section 5 of this 1979 Act within such time as is necessary to allow the board to prepare and issue a final order in compliance with the requirements of section 4 of this 1979 Act. If additional time is required, the commission shall obtain the consent of the parties for a postponement.

"(4)  No determination of the commission issued under subsection (3) of this section is valid unless all members of the commission have received the recommendation of the board in the matter and any exceptions thereto that were timely filed with the board and at least four members of the commission concur in its action in the matter."

adequacy of the record to support the County's findings relating to compliance with Goal 3. For reasons which follow, we conclude that LUBA may consider issues not raised before the local body.

■     As we read sections 3 and 4 of the 1979 Act, it is sufficient to give LUBA jurisdiction to review a land use decision if a determination made by a county concerns the application of a statewide planning goal.[4] Or Laws 1979, ch 772, § 3. Section 4 of that Act gives standing to file notice of intent to appeal, petition for review or to intervene in the proceedings before LUBA to a broad range of persons. Subsections (2) and (3) of section 4 provide:

> "(2)   Except as provided in subsection (3) of this section, any person whose interests are adversely affected or who is aggrieved by a land use decision and who has filed a notice of intent to appeal as provided in subsection (4) of this section may petition the board for review of that decision or may, within a reasonable time after a petition for review of that decision has been filed with the board, intervene in and be made a party to any review proceeding pending before the board.

> "(3)   Any person who has filed a notice of intent to appeal as provided in subsection (4) of this section may petition the board for review of a quasi-judicial land use decision if the person:

> "(a)   Appeared before the city, county or special district governing body or state agency orally or in writing; and

> "(b)   Was a person entitled as of right to notice and hearing prior to the decision to be reviewed or was a person whose interests are adversely affected or who was aggrieved by the decision.

■■     It appears that if the land use decision is not quasi-judicial, any person whose interests are adversely affected or who is aggrieved may seek review by LUBA without

___

[4] Section 3 of the 1979 Act defines "land use decision" to mean:

"* * * * *

"(a)   A final decision or determination made by a city, county or special district governing body that concerns the adoption, amendment or application of:

"(A)   The state-wide planning goals;

"* * * * * *"

regard to whether that person appeared before the local body. If the decision is quasi-judicial, a person who appeared before the local body orally or in writing and meets the requirements of Section 4(3)(b) may seek review. There is nothing in the Act to suggest that the person seeking review (or participating in the LUBA proceedings) must have raised specific issues before the local body, or that the person is bound by issues raised by another person before the local body. Apparently it is enough if the person states orally, or writes, "I object to the application." We conclude, therefore, that it is not necessary for the party seeking LUBA review to have raised below the issue on which review is sought,[5] regardless of whether the local proceeding was quasi-judicial, so long as the party has standing.

■     The other prong of the County's first contention is that the issue was not raised before LUBA. The statute (Or Laws 1979, ch 772, § 4(6)(c)) requires that the petition for review state the issues the petitioner seeks to have reviewed. As we view the City's petition, it fairly raised the issue of whether there was substantial evidence in the record "to support approval of this major partition and to demonstrate compliance with all existing rules, regulations and court decisions," specific reference being made to Goal 3. Concededly, a principal argument of the City was that the evidence must support a finding that the partition would result in greater agricultural use, relying on *Meeker v. Board of Commissioners,* 287 Or 665, 601 P2d 804 (1979), which contention LUBA properly rejected as being an incorrect legal standard. However, LUBA concluded that the record did not support the findings which purported to apply the correct standard. We conclude that LUBA had authority to consider the general issue of whether the record supported the findings and conclusions about which the City complained.

---

[5] The County's reliance on *Menges v. Bd. of Comm.,* 45 Or App 797, 609 P2d 847 (1980), *rev allowed* 289 Or 587 (1980), is misplaced. The issue sought to be raised there was raised for the first time in the Court of Appeals; more importantly, the proceeding was a writ of review, which was governed by different statutes which have been superseded with respect to land use decisions by the 1979 Act establishing LUBA.

The remaining issue is whether there is substantial evidence in the whole record[6] to support the County's findings, particularly Finding 8, which purported to support its conclusion that applicant has satisified the criteria[7] we set forth in *Jurgenson v. Union County Court,* 42 Or App 505, 600 P2d 1241 (1979), as necessary to permit a major partition of agricultural land. The second criterion is that "the lot sizes created by the partition will be sufficient for the continuation of the existing commercial agricultural enterprise in the area; * * *." 42 Or App at 511. The County concluded that:

"The Applicant has addressed and satisfied the second *[Jurgenson]* criterion in that he has demonstrated that the lot sizes created by this partition are sufficient for the continuation of existing agricultural enterprises in the area."

It is agreed that the County relied on the letter, referred to earlier, from the Lane County Extension Service and attempted to paraphrase it in Finding 8, which states:

"The Lane County Extension Service operated by Oregon State University, by letter dated December 21, 1979 from Paul Day, Livestock Agent, acknowledges and confirms that a 5-acre parcel is a typical size of operation for commercial sheep operators in Lane County and the entire

---

[6] Section 4(7) of the 1979 Act provides:

"(7) Review of a decision under sections 4 to 6 of this 1979 Act shall be confined to the record. In the case of disputed allegations of unconstitutionality of the decision, standing, ex parte contacts or other procedural irregularities not shown in the record which, if proved, would warrant reversal or remand, the board may take evidence and make findings of fact on those allegations. The board shall be bound by any finding of fact of the city, county or special district governing body or state agency for which there is substantial evidence in the whole record."

[7] The three criteria set forth in *Jurgenson v. Union County Court,* 42 Or App 505, 511, 600 P2d 1241 (1979), are:

"In order to satisfy Goal 3, an owner seeking to partition land has the burden of proving: (1) the predominant soil classes on the property are other than agricultural land within the Goal 3 definition, *see Meyer v. Lord,* 37 Or App 59, 586 P2d 367 (1978), *rev den* 286 Or 303 (1979); or (2) the lot sizes created by the partition will be sufficient for the continuation of the existing agricultural enterprise in the area; or (3) the factors set out in ORS 215.213, and incorporated by reference into Goal 3, relevant to permitting nonfarm uses — usually meaning residential use — on agricultural land are met, *see Rutherford v. Armstrong,* 31 Or App 1319, 572 P2d 1331 (1977), *rev den* 281 Or 431 (1978)."

Willamette Valley. Sheep operators use the 5-acre parcel as a 'home base' from which sheep are transported to rented or leased grazing areas for a majority of their feed and development. This type of operation is particularly suited to the Willamette Valley and this portion of Lane County because of the large amount of grass seed and grain fields which provides forage and complements the seasonal feed needs of sheep producers. The grass seed industry provides a vast amount of feed for grazing sheep which benefits both the sheep producer and the grass seed producer. The record further indicates that it is uneconomical for sheep producers to own a large amount of property since it is desirable for sheep to graze on fields that have not been continually grazed in the past by sheep. Constant use of the same field by sheep herds over a period of time multiplies the risk of parasites in the herd. For that reason, it is desirable to alternate grazing fields both to capitalize on feed potential and to reduce the possible harm from parasites."

That finding, if supported by the record, would support the conclusion quoted above. However, the livestock agent's letter, which is set forth in the margin,[8] does

---

8    "* * * * *

"Operating a flock of several hundred or a thousand ewes on a 5-acre farm may at first seem out of the question. It is, however, possible under existing circumstances in this area. Most, if not all, of the major commercial sheep operators in Lane County operate out of a 'home base' which consists of barn(s), a stock handling system (corrals, etc.), feed storage, equipment storage, and a home. They rely for the most part on rented or leased grazing areas for the majority of their feed and consequently don't always have grazing land contiguous to the base operation. The base operation is used for lambing, mass management work (shearing, animal health procedures, etc.), and sometimes as a staging area for marketing procedures. Minor management work (e.g., treatment of individuals or small groups of sheep for health problems) and some market procedures are handled at the various grazing sites with the use of portable equipment and the assistance of a good sheep dog.

"This type of sheep management system is somewhat unique to the Willamette Valley. It fits well for two reasons. First, the natural forage production pattern through the year meshes closely with the seasonal feed needs of sheep production. This allows for nearly year around grazing of sheep and eliminates the need for extensive feeding and feed storage facilities. Secondly, the large grass seed industry in the Willamette Valley produces, as a secondary product, a vast amount of forage which can be harvested by grazing sheep to the mutual benefit of both the sheep producer and the seed producer. The availability of feed under these circumstances makes it unnecessary for the sheep producer to own the land he grazes. Indeed, many would argue that it is economically unfeasible to own the land under these

not go so far as the County's paraphrasing of it. The letter states that most, if not all, major commercial sheep operators in Lane County operate out of a "home base," and goes on to say:

"* * * They [referring to most major operators] rely for the most part on rented or leased grazing areas for the majority of their feed and consequently don't always have grazing land contiguous to the base operation. * * *"

■ · The County's finding, however, is that a five acre parcel is a *typical size* of operation for commercial sheep operators in the county, and that *they use the five acre parcel as a "home base."* The letter on which the finding is based does not say that; it says only that it is possible to use five acres as a home base. Therefore, the finding, as made, is not supported by substantial evidence, and the conclusion based thereon falls with it. We do not decide whether the record would support another finding which would support the conclusion.

■ The County contends that LUBA exceeded its authority by requiring that the record contain an inventory of commerical agricultural operations in the area around the applicant's 142-acre farm in order to establish that the County's decision complies with Goal 3. We do not understand LUBA's opinion to so require; it states only that Goal 3's lot size standard is difficult, if not impossible, to apply in the absence of an inventory of the existing commercial agricultural enterprise within the area to provide a basis for determining the appropriate parcel size. It seems apparent that such evidence here would have facilitated the determination required to be made. In *Meeker v. Board of Commissioners, supra,* it does not appear that there was an inventory of agricultural lands. The court pointed to other evidence in the record and observed:

conditions. Successful management of such an operation requires that the sheep producer be mobile and that he have a home base facility such as Mr. Drake describes from which to operate.

"Some of the sheep producers in Lane County own their base operations and others rent or lease them. The location of Mr. Drake's property in the grass seed producing area of the county of its proximity to major highways would strengthen its value as a base operation to either an owner or lease holder."

"In other words, this *aggregate* of agricultural activity constitutes the 'commercial agricultural enterprise within the area' that Goal 3 requires be continued by the utilization of appropriate lot sizes. * * *" (Emphasis in original.) 287 Or at 674.

LUBA's statement in its decision that without an inventory it was unable to determine whether the County's decision is in conformance with Goal 3 means only that the evidence in the whole record is not sufficient to support the County's findings.

Affirmed.